```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
___

ALEXANDER ALBINO,

                        Plaintiff,

    -vs-　　　　　　　　　　　　　　　　**DECISION and ORDER**
　　　　　　　　　　　　　　　　　　　　　　**No. 6:14-cv-06519(MAT)**
GLOBAL EQUIPMENT USA, LTD.,

                        Defendant.
___

GLOBAL EQUIPMENT USA, LTD.,

  Defendant/Third-Party Plaintiff,

   -vs-

H. P. NEUN COMPANY, INC., ISOWA
AMERICA, INC. and ISOWA CORPORATION,

      Third-Party Defendants.
___

## INTRODUCTION

Alexander Albino ("Plaintiff"), represented by counsel, instituted this diversity action against Global Equipment USA, LTD. ("Global" or "Defendant"), alleging causes of action based on strict products liability and negligence as the result of injuries he sustained while he was employed at third-party defendant H.P. Neun Company, Inc. ("H.P. Neun"). Presently before the Court is Global's Motion to Dismiss the Complaint for Lack of Personal Jurisdiction (Dkt #45).

**BACKGROUND**

Plaintiff, who is presently a resident of the State of Florida, was employed at H.P. Neun at all times relevant to this action. Prior to its acquisition by Jamestown Container Corporation, H.P. Neun was a New York corporation, engaged in the manufacture of packaging materials. Plaintiff was injured while working at one of H.P. Neun's production facilities on September 8, 2012, while operating an ISOWA 66" x 125" 2/Color Flexo Rotary Die Cutter ("the Machine").

The Machine originally was imported into the United States by third-party defendant ISOWA Corporation ("ISOWA Corp.") or a predecessor company to third-party defendant ISOWA America, a wholly owned subsidiary of Japan-based ISOWA Corp.

At some point prior to July 2008, the Machine was owned by third-party defendant and Michigan domiciliary Arvco Container Corp. ("Arvco"), which entered into an agreement to have Global list the Machine and broker any ensuing sale. Global, an Illinois corporation with a principal place of business in Vernon Hills, Illinois, is a nationwide and worldwide distributor of new and used corrugated box making and converting equipment.

On May 20, 2008, Global employee Robert Mages ("Mages") sent a letter to Bruce Chilton ("Chilton") at H.P. Neun stating, "We are pleased to offer you the following equipment [i.e., the Machine] for your consideration[.]" The letter provided additional details

regarding the Machine's features, listed an asking price of $285,000, and included a series of photographs of the Machine. On July 21, 2008, Mages noted that he "t/w [talked with] Bruce [Chilton] - should have a decision made this week. . . . He will respond back to me."

On July 30, 2008, Global sent a contract ("the Contract") to H.P. Neun regarding the sale and shipment of the Machine, indicating that it was being "SOLD TO" H.P. Neun for $275,000. See Contract, p. 1. Under "SHIP TO", the Contract states, "AS INSTRUCTED." The Contract further states that Machine is "sold as is[,] where is[,] as inspected by H.P. Neun." Id. "Unless otherwise provided" in the Contract, "delivery shall be made F.O.B. [Free on Board] place of shipment and Seller shall deliver the machinery to a common carrier . . . selected by Seller." Id., p. 2, ¶ 6. H.P. Neun sent a check in the amount of $101,666.66 to Global on or about August 8, 2008.

Meanwhile, on August 6, 2008, Jack Secord of Arvco sent a letter to H.P. Neun indicating that he would release the Machine upon receipt of a signed contract and a deposit payment. On August 12, 2008, Global sent a Purchase Order to Arvco, indicating a purchase price of $265,000 for the Machine, and stating that the Machine was to be shipped to Global as instructed. Also on that date, Global sent Arvco a check in the amount of $81,666.66.

On August 19, 2008, Mages sent an email to Global employee

Justin Farrell ("Farrell") regarding the H.P. Neun contract, and instructing Farrell to begin dismantling the Machine the week of September 22, 2008. Mages provided other instructions to Farrell regarding shipping arrangements for the Machine, which was to be shipped to H.P. Neun in Fairport, New York.

Approximately four years later, on September 8, 2012, while operating the Machine at a production facility owned and operated by H.P. Neun, Plaintiff's left hand became caught between a set of nip rollers in the Machine's feeder mechanism and was crushed. As a result of his injuries, Plaintiff was required to undergo surgery to amputate the index, middle, ring, and little fingers on his left hand.

Plaintiff instituted this action against Global on August 27, 2014, alleging causes of action for strict products liability and negligence based on the September 8, 2012 incident. On January 18, 2016, Global filed third-party actions against Arvco, H.P. Neun, ISOWA America and ISOWA Corp., although it voluntarily dismissed the third-party action against Arvco on March 2, 2016.

Limited jurisdictional discovery ensued. Global filed the instant Motion to Dismiss for Lack of Jurisdiction (Dkt #45) and supporting memorandum of law with exhibits (Dkt ##46-1 to 46-6) on February 26, 2016. Plaintiff filed papers in opposition (Dkt ##63-67), and Global filed reply papers (Dkt ##71-1 to 71-5). H.P. Neun filed papers in support of Global's motion to dismiss (Dkt ## 61-

62). For the reasons discussed below, Global's motion is denied.

## GENERAL LEGAL PRINCIPLES

A federal court may exercise personal jurisdiction over a defendant if the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." FED. R. CIV. P. 4(k)(1)(A).[1] Personal jurisdiction can be either general or specific. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 n. 9 (2d Cir. 2012). Under New York law, Civil Practice Law and Rules ("CPLR") sections 301 and 302 provide a basis for general and specific personal jurisdiction, respectively.

General jurisdiction is proper where the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011) (quotation omitted). Specific jurisdiction, on the other hand, "depends on an 'affiliation between the forum and the underlying controversy,'" id. (brackets and quotation omitted), and is "confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" Id. (quotation omitted). Here, Plaintiff does not allege general

---

[1] The first requirement for the exercise of personal jurisdiction is that the plaintiff's service of process upon the defendant was procedurally proper. In re Kalikow, 602 F.3d 82, 92 (2d Cir. 2010) (citations omitted). Global does not deny that it was properly served with Plaintiff's Summons and Complaint.

jurisdiction over Global, arguing instead that Global is subject to specific personal jurisdiction under several subsections of CPLR 302(a).

Once general or specific jurisdiction is established, the court must verify that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles[,]" Licci ex rel. Licci, 673 F.3d at 60, which "protect[ ] an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72 (1985) (quotation omitted).

## DISCUSSION

Plaintiff argues that Defendant is subject to personal jurisdiction under CPRL 302(a)(1), CPLR 302(a)(3)(i), and CPLR 302(a)(3)(ii). As discussed further below, the Court finds that Plaintiff has adequately demonstrated specific jurisdiction under CPLR 302(a)(3)(ii). The Court therefore need not determine whether specific jurisdiction lies under CPRL 302(a)(1) or CPLR 302(a)(3)(i).

### I. CPLR 302(a)(3)(ii)

CPLR 302(a)(3) provides in pertinent part that

> [a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: . . .
>
> 3. [1] commits a tortious act [2] without the state [3]

> causing injury within the state . . . if he . . .
>
>> (ii) expects or should reasonably expect the acts to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. CIV. PRAC. L. & R. 302(a)(3)(ii). Here, Plaintiff has adequately alleged the first three elements set forth in the prefatory language of CPLR 302(a)(3), namely that (1) Global committed a tortious act (i.e., brokering the sale of an allegedly defective product) (2) outside of New York (either in Illinois, Global's principal place of business, or in Michigan, Arvco's principal place of business), (3) that caused injury to Plaintiff in New York. See Complaint ("Compl.") (Dkt #1) ¶¶ 5-34. These factual allegations suffice at the pleading stage. See Gucci Am., Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228, 241 (S.D.N.Y. 2010) ("A plaintiff 'need not actually prove that defendant committed a tort' to satisfy the first element of [CPLR] § 302(a)(3)(ii), 'but rather need only state a colorable cause of action.'") (quoting Sole Resort, S.A. de C.V. v. Allure Resorts Mgmnt., LLC, 450 F.3d 100, 106 (2d Cir. 2006); (further quotation omitted)); see also Levans v. Delta Airlines, Inc., 988 F. Supp.2d 330, 337 (E.D.N.Y. 2013) (For purposes of CPLR 302(a)(3)(ii), "where a manufacturer ships a defective product to New York where it injures a New York resident, the injury clearly occurs in New York.") (citation omitted).

The first prong of subsection (ii) of CPLR 302(a)(3) is a foreseeability requirement. "The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one." Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 241 (2d Cir. 1999) (quoting Allen v. Auto Specialties Mfg. Co., 357 N.Y.S.2d 547, 550 (3d Dep't 1974)). New York courts have attempted to apply the "reasonable expectation" requirement in a manner consistent with United States Supreme Court precedent on the due process limits of state-court jurisdiction. Kernan, 175 F.3d at 241 (citing In re DES Cases, 789 F. Supp. 552, 570-71 (E.D.N.Y. 1992) (collecting cases)). Thus, "the mere likelihood that a defendant's product will find its way into New York does not satisfy" the "reasonable expectation" element; rather, "purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required." In re DES Cases, 789 F. Supp. at 570-71 (citing, inter alia, Schaadt v. T.W. Kutter, Inc., 564 N.Y.S.2d 865, 866 (3d Dep't 1991) ("[I]t is not enough that a defendant foresaw the possibility that its product would find its way here; foreseeability must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market.").

In interpreting the "reasonable expectation" requirement, New

York courts "have focused on whether there were concrete facts known to the nondomiciliary that should have alerted it that its product would enter the New York market." Am. Network, Inc. v. Access Am./Connect Atlanta, Inc., 975 F. Supp. 494, 497 (S.D.N.Y. 1997) (citing Darienzo v. Wise Shoe Stores, Inc., 427 N.Y.S.2d 831, 833 (2d Dep't 1980) (nondomiciliary shoe manufacturer should have expected New York consequences from its manufacture of shoes because it was aware that a Tennessee distributor to which its shoes were shipped would distribute them to New York retailers); other citation omitted). Here, as discussed further below, the relevant documentation establishes that Global affirmatively knew the Machine was destined for New York.

While the section of the Contract headed, "SHIP TO", states, "AS INSTRUCTED," the documentation subsequently exchanged between Global and H.P. Neun clarified where the Machine was to be shipped to (Fairport, New York). Moreover, it establishes that Global, in fact, was involved in making and the shipping arrangements and coordinating communications among the companies involved in accomplishing shipment of the Machine. Global employee Mages, who initially had contacted H.P. Neun offering to sell them the Machine, sent an email on August 19, 2008, to fellow Global employee Justin Farrell ("Farrell") "[r]egarding the H.P. Neun contract" and instructing Farrell to "[b]egin dismantling [the Machine] the week of 9/22/08." See Ex. 3 to Belanger Decl. (Dkt

#63). Mages also told Farrell to "[talk with] Doug [Cantrell ("Cantrell") of Corrugated Machinery] near to that date to find out when he would need trucks . . . to be billed to H.P. Neun." Mages noted, "[W]e need to relocate unitizer . . . to Arvco to be reloaded by Doug to go to H.P. Neun for install." In emails exchanged between Farrell and non-party Synergy Global Transportation, Inc. employee Steve Crawford ("Crawford"), Farrell informed Crawford of the dates and locations of the various pick-up points, along with the number and type of trucks needed. See Ex. 3 to Belanger Decl. (Dkt #63). Thus, the logistical decisions regarding shipment of the Machine were made by Global.

Finally, an invoice stamped, "PAID," from Global to H.P. Neun dated September 29, 2008, indicates that the Machine was sold to H.P. Neun, and that it was "SHIP[PED] TO" H.P. Neun at an address in Fairport, New York. It was installed by Cantrell of Corrugated Machinery, a subcontractor who was paid by H.P. Neun, but procured by Global for the job. Moreover, Global's owner and CEO, James Schiffman ("Schiffman"), testified at his deposition that he knew the Machine was being shipped to New York. See Schiffman: 144-45.[2]

The Court finds that the foregoing facts are sufficient to meet the "reasonable expectation" requirement under CPLR 302(a)(3)(ii). See, e.g., LaMarca v. Pak-Mor Mfg. Co., 95 N.Y.2d

---

[2] Citations in the form, "Name: Numeral(s)", refer to page numbers from the individual's deposition transcript.

210, 215 (2000) ("Pak-Mor's invoice, including its reference to a 'New York Light Bar,' shows that it knew the rear-loader was destined for use in New York. Clearly, Pak-Mor had reason to expect that any defects would have direct consequences in this State.").

Turning next to the "substantial revenue from interstate or international commerce" element, "one of the statute's purposes is to exclude non-domiciliary businesses of a local nature." Vecchio v. S & T Mfg. Co., 601 F. Supp. 55, 58 (E.D.N.Y. 1984); see also David D. Siegel, New York Practice § 88 (5th ed. 2011) (describing C.P.L.R. § 302(a)(3)(ii) as a "bigness requirement" designed to assure that the defendant is "economically big enough" to defend suit in New York). New York courts have analyzed the substantiality of defendants' revenues from interstate or international commerce in both relative and absolute terms. Ronar, Inc. v. Wallace, 649 F. Supp. 310, 316 (S.D.N.Y. 1986) (comparing cases). However, "neither approach is binding," id., and "each case must be decided on its own facts[.]" Chunky Corp. v. Blumenthal Bros. Chocolate Co., 299 F. Supp. 110, 115 (S.D.N.Y. 1969). There is "no decision" setting "an absolute number at which interstate commerce is considered to be 'substantial.'" Hamilton v. Accu-Tek, 32 F. Supp.2d 47, 68 (E.D.N.Y. 1998). Rather, courts have stressed the need for flexibility; "the overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums" are "among the most important facts" to consider.

Ronar, Inc., 649 F. Supp. at 317 (citing Path Instruments Int'l Corp. v. Asahi Optical Co., 312 F. Supp. 805, 810 (S.D.N.Y. 1970) (notwithstanding that defendant's "small size may render it a marginal case," "given the inherently and almost exclusively interstate character of its business operations as a sales and distributional arm of a much larger organization, the revenue it derives from interstate commerce is sufficient to meet the requirements of 302(a)(3)(ii)"); other citation omitted).

At the outset, the Court notes that Global's "business can hardly be characterized as 'local.'" LaMarca, 95 N.Y.2d at 215. Global's website describes the company as "The World's Corrugated Machinery Supplier. . . A Full Service Company. . . Not Just a Broker[,]" and asserts that Global "is one of the largest distributors of new and used corrugated box making and converting equipment in the USA and throughout the world."[3] In addition to having customers in New York, Global serves customers in "47 other states and 62 other countries." See Schiffman: 163-64. Significantly, Schiffman testified regarding the international character of Global's business as follows:

> [W]e have an arsenal of people that we know throughout the world so if we're transacting of helping somebody with a machine in Australia, we know of machinery movers there and . . . we recommend all these people based on experience. . . . [W]e help people buy and sell machines in the process of brokerage with various vendors that can

---

[3] http://www.boxmachine.com/ (last accessed Aug. 15, 2016) (ellipses in original).

help with the process.

Schiffman Dep. at 20-21.

Global estimates that in 2016, about 30 to 45 percent of its business was derived from international transactions. See Schiffman: 19-20. In the period 2005 to 2015, Global's gross revenue from the New York market was not more than $4,000,000, while its entire domestic gross revenue for the same period was not more than $48,000,000. See Belanger Decl. (Dkt #63) at 7, ¶ 12 (citing Schiffman: 51-54; Global's Response Nos. 6 & 7 to Plaintiff's First Set of Interrogatories).

On the present record, Plaintiff has established that Global derives substantial revenue from interstate and international commerce for purposes of CPLR 302(a)(3)(ii). See, e.g., LaMarca, 95 N.Y.2d at 215 (The defendant, "[a] Texas corporation with a manufacturing facility in Virginia[,] is inherently engaged in interstate commerce. Moreover, the company had a New York distributor and a district representative. Its national advertising and New York sales figures alone show that the company derives substantial revenue from interstate commerce.") (footnote omitted); Nichols v. Surgitool, Inc., 419 F. Supp. 58, 63 (W.D.N.Y. 1976) (holding that where defendants' business was national in scope and gross sales over a 7-year period totaled over $3.7 million, there was substantial interstate revenue).

**II. Due Process Inquiry**

Having resolved the state-law jurisdictional question, the Court must determine whether the exercise of personal jurisdiction over Global is consistent with the due process protections provided by the United States Constitution. See Ehrenfeld v. Mahfouz, 489 F.3d 542, 547 (2d Cir. 2007) ("[E]ven if the New York Court of Appeals concludes that personal jurisdiction is proper under § 302(a)(1) of the New York long-arm statute, this Court must make the ultimate determination whether this jurisdiction satisfies constitutional due process."). "Due process considerations require that the defendant 'have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Licci ex rel. Licci, 732 F.3d at 169 (quotation omitted; internal quotation marks omitted in original; brackets in original).

The evidence obtained by Plaintiff during jurisdictional discovery establishes that Global has purposefully directed a portion of its business activities toward New York markets. For instance, from at least 2007 to 2013, Global had a New York sales territory, with an employee designated to work that territory. Global also maintained a database of New York customers for use by its sales representatives. This database identified the Global employee responsible for each New York customer and included a "notes" section where the sales representative could record the sales calls made to each customer and schedule a date for the next

sales contact. From 2005 to 2015, Global regularly solicited business in New York from at least 25 companies, sending at least 150 offer letters for the sale of at least 169 box making machines. H.P. Neun, in particular, has been a Global customer since at least 1998, and has purchased other new and used box making equipment from Global, in addition to the Machine. See, e.g., Schiffman: 141-56; Exs. 6 & 13 to Belanger Decl. (Dkt #63). On September 25, 2006, for example, Global sold H.P. Neun a used 2-color Piemonte Flexo Folder Gluer for $40,000. On December 5, 2007, Global sold H.P. Neun one new Global Easyfeed feed assist unit for $38,000, and installed the unit at a cost of $4,200. At present, Global is listing on its website approximately twelve pieces of equipment located at the former H.P. Neun facility, on behalf of Jamestown Container Corporation, the company that recently purchased H.P. Neun. See Schiffman: 156-58; Ex. 10 to Belanger Decl. (Dkt #63). The foregoing facts are sufficient to establish at this point in the proceedings that Global "purposefully availed" itself of the privileges of doing business in New York such that it could foresee being "haled into court" here. See Burger King Corp. v. Rudzewicz, 471 U.S. at 475.

Next, the Court must consider whether the exercise of long-arm jurisdiction over Global "is reasonable under the circumstances of [this] case." Kernan, 175 F.3d at 244 (quotations omitted; alteration in original). The "reasonableness" inquiry looks at the

following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 568 (2d Cir. 1996) (citations omitted).

First, there admittedly would be a "burden . . . impose[d]" on Global, a nondomiciliary of New York, if it is forced to defend a lawsuit here. While this factor weighs against the reasonableness of exercising long-arm jurisdiction, it is less important in this era of computers and the ability to communicate and send information almost instantaneously. Indeed, courts in recent years have declined to find that a corporation headquartered outside of the United States is sufficiently inconvenienced by being sued in this country to defeat personal jurisdiction. <u>See</u> <u>Kernan</u>, 175 F.3d at 244.

Second, New York's interest in the instant dispute is relatively strong since, at the time of his injury, Plaintiff was a New York resident. Although Plaintiff has since moved to Florida, there appears to be no dispute that New York products liability and negligence law apply in this case. Thus, this factor weighs in

favor of finding the exercise of long-arm jurisdiction reasonable.

Third, while Plaintiff is no longer a New York resident, his interest in obtaining convenient and effective relief "is furthered by maintaining [his] choice of venue." Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp.2d 345, 360 (S.D.N.Y. 2007). See also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984) ("[A] plaintiff's residence in the forum State is not a separate jurisdictional requirement, and lack of residence will not defeat jurisdiction established on the basis of the defendant's contacts.").

The fourth factor—efficient resolution of the controversy–favors a New York forum, since the allegedly defective piece of equipment is presently located in New York, the situs of Plaintiff's injury. See Kernan, 175 F.3d at 245. While the Machine's design and manufacture took place in Japan, evidence regarding those topics is likely to be documentary in nature and likely will not necessitate calling witnesses from Japan. See id. Accordingly, this factor weighs in favor of exercising jurisdiction over Defendant.

With regard to the fifth "reasonableness" factor, "there is no indication that any substantive social policy will be advanced or impeded by the exercise of jurisdiction[,]" In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig., 399 F. Supp. 2d 325, 334 (S.D.N.Y. 2005), over Global by the State of New York.

-17-

Therefore, the shared interest of the states in advancing substantive social policies is a neutral factor in this case.

Upon reviewing the above discussion of the due process "reasonableness factors," the Court notes that the first factor supports Global's position, while the second, third and fourth factors weigh in favor of the exercise of long-arm jurisdiction. In these circumstances, the Court concludes that exercising personal jurisdiction over Global would not offend "'traditional notions of fair play and substantial justice[,]'" Calder v. Jones, 465 U.S. 783, 788 (1984) (quotations omitted). Therefore, the Court denies Global's motion to dismiss the Complaint for lack of personal jurisdiction. See Kernan, 175 F.3d at 245 (affirming district court's denial of motion to dismiss third-party action for lack of personal jurisdiction where first reasonableness factor tipped in third-party defendant's favor, whereas the second, third, and fourth factors weighed in favor of exercising jurisdiction).

## CONCLUSION

For the foregoing reasons, Global's Motion to Dismiss the Complaint for Lack of Jurisdiction (Dkt #45) is denied. Plaintiff's Complaint against Global may proceed.

**SO ORDERED.**

**S/ Michael A. Telesca**

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   August 18, 2016
         Rochester, New York